UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BETTY LEWIS,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )     Case No. 4:05CV1120 CDP
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Betty Lewis's two applications for benefits under the Social Security Act.  The first

application is for disability insurance benefits under Title II of the Act, 42 U.S.C. §§

401, et seq.  The second application is for supplemental security income (SSI)

benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.

Section 205(g) of the Act, 42 U.S.C. §§ 405(g), provides for judicial review of a

final decision of the Commissioner under Title II, and Section 1631(c)(3) of the Act,

42 U.S.C. § 1383(c)(3), provides for judicial review of a final decision under Title

XVI.  Lewis claims that she is disabled due to asthma, back and abdominal pain,

carpal tunnel syndrome, endometriosis, depression, lower extremity venous

insufficiency, ventral hernia and knee problems.  The Administrative Law Judge

(ALJ), however, found that Lewis was not disabled. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

## Procedural History

On August 7, 2001, Lewis filed her applications for disability benefits under Title II and Title XVI. On July 11, 2003, following a hearing, the ALJ issued a decision that Lewis was not disabled. After the Appeals Council of the Social Security Administration (SSA) denied her request for review, Lewis appealed the decision to this Court. Her case was assigned to Magistrate Judge Thomas C. Mummert, III, who reversed and remanded the case for further proceedings in July of 2004 upon the motion of the Commissioner. See Betty Lewis v. Jo Anne B. Barnhart, Commissioner of Social Security, Case Number 4:04CV42 TCM. A second hearing was held on November 4, 2004, and the ALJ thereafter rendered a decision that Lewis was not disabled. On June 22, 2005, the Appeals Council of the SSA denied Lewis's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

At the time of the first hearing before the ALJ, Lewis was 35 years old and married with three children.  She weighed 260 pounds and had a high school education.  Although she had a driver's license, Lewis testified that she did not drive because her medications (Methadone and Alprazolam) made her drowsy.   Lewis testified that she drops things because of the pain in her hands caused by carpal tunnel syndrome.  Lewis further stated that pain in her lower back, arm and abdomen prevent her from sitting upright, bending over, lifting her arms above her head or reaching.

Lewis stated that the pain in her lower back and abdomen resulted from hernias, and that she had undergone surgery to repair and replace the mesh lining inside her abdomen about three weeks before the hearing.  Lewis testified that she was in pain from the surgery because the mesh inserted into her abdomen "pokes" her, and that she was rendered incontinent by the procedure.   She also believed that her back pain had increased following the surgery "[b]ecause I don't know, the nerves and stuff in there."  Lewis estimated that, on a scale of one to ten with ten representing intense pain, the pain in her abdominal area rated a ten "all of the time," and the pain in her back rated "at least an eight, but close to a ten."

Lewis stated that her left arm is now shorter and weaker than her right arm because it was ripped off during a childhood accident and reattached. She stated that her hands would sometimes "go to sleep" at night and the pain would wake her up. Lewis also testified that she suffers from restless leg syndrome and enlarged veins in her legs, as well as knee pain. Lewis stated that her doctor prescribed the use of a cane for her knee problems, and that she can only stand for five to ten minutes without it. She further claimed that her enlarged veins cause her legs to start "sweating and just irritating me."

Lewis also claimed that she is disabled because she had endometriosis at one time, and she believes "there's still some in there or scar tissue . . . ." Lewis currently uses two inhalers (one daily, the other for attacks) for asthma.

Finally, Lewis testified that her treating physician Dr. Mason prescribed Effexor XR and Neurontin for depression. Upon questioning by the ALJ, Lewis admitted that she was not receiving psychiatric or psychological treatment and had not sought such treatment because, "I just really don't like them."

As far as daily activities, Lewis testified that, at most, she could lift a gallon of milk. Lewis stated that, because she cannot stand or bend, she does not cook, do the laundry or perform household chores for the family. She can push the cart at the grocery store, but her children put the groceries in it. Upon questioning by the ALJ,

Lewis claimed that after her children leave for school she drinks coffee and sleeps at least 16 hours per day. She also talks on the phone, watches television and tries to walk for about 30 minutes. Lewis further testified that she and her husband do not eat anything during the day except cookies for a snack. Lewis smokes one-half pack of cigarettes per day.

Lewis testified that she previously worked as a sewing machine operator, cook, cashier, nurse's aide and maid, but that the pain in her back and abdomen would prevent her from performing these jobs.

After remand, a second hearing was held on November 9, 2004. At the time of the second hearing, Lewis was 37 years old and still married with three children. Lewis was represented by counsel, who told the ALJ that his client was disabled because she suffered from hernias, psychiatric conditions, back pain and depression. When questioned about why she entered the hearing room using a cane and holding onto her attorney's arm, Lewis responded that her knee was swollen and arthritic and that she dropped a plate on her foot. Lewis said that her treating physician Dr. Schuetz advised her to use the cane.

Lewis stated that the last job she worked was as a sewing machine operator in December of 1999. In addition to the jobs mentioned at the first hearing, Lewis also testified that she worked in a shoe factory for about one month. She told the

ALJ that she left her sewing job because of her hernia problems, and that she could not work at the time of the hearing because "I have emphysema. I have trouble walking very far. I can't hardly breathe. I get to coughing a lot. And I have accidents in my pants. I wet myself. I have asthma, a reoccurring hernia." She also said that she was unable to work because she is in pain and "[o]verweight. I don't feel comfortable around people."

Lewis told the ALJ that she could not perform a job which required her to work at a desk or table because she can only sit a reclined position due to her hernia. She also believed that her hernia would prevent her from returning to work as a nurse's aide because she could not lift patients. Lewis stated that she had been hospitalized two or three times since 1999 for hernia repairs and that she found it difficult to walk because of her hernias and her knee "pops out of place." Lewis estimated that her knee problems increased since 1999.

Lewis was treated for emphysema and asthma by Dr. Mason, who also prescribed antidepressants for her. At the hearing Lewis claimed she was currently taking Zoloft, Prozac, Trazodone and Neurontin for her depression and nerves. Dr. Schuetz prescribed these medications. When asked about her problems associated with depression, Lewis responded, "My crying controls me." She stated that she has crying spells about four times per week that last between 30 minutes and two

hours.  Lewis testified that her daughter performed all of the household chores.

Gary Weimholt, vocational expert, testified on behalf of the Social Security Administration.  Weimholt testified that Lewis's past work as a sewing machine operator would be classified as light, even though she was seated, because of the repetitive use of foot controls.  He also stated that the cashier job would be classified as an unskilled cashier job.  The ALJ posed the following hypothetical question to the vocational expert:

> Q:      Okay.  I'd like you to assume we have a hypothetical individual with the age, education and work experience of the claimant who can occasionally lift and carry 20 pounds, frequently lift and carry 10; who can do no climbing; can occasionally use a ramp or stairs; and can bend, crouch and crawl occasionally.  That's going to be hypothetical number one, which is the RFC of the case that was remanded. Hypothetical number two is going to be the same factors with the following additional: No more than occasional interaction with supervisors, coworkers and the public, and the interaction must be superficial and brief; and is also restricted to simple repetitive work activities.  The third hypothetical: No lift and carry over 10 pounds; can stand, walk for two hours over an eight hour day but no more than 30 minutes at a time; can sit for about six hours over an eight hour day; can lift from the floor infrequently, which I will specify as less than occasionally; can engage in postural activities such as stooping, bending, crouching, crawling infrequently, which  again means less than occasionally; and I'm also going to add in no more than occasional interaction of a brief and superficial nature with supervisors, coworkers, and the public; and lastly, limited to simple and repetitive work activity.  Okay.  Would all three of these hypotheticals preclude the past work as a sewing machine operator?

Weimholt testified that the first hypothetical question would not preclude

work as a sewing machine operator and that there were approximately 750 of those jobs in the state of Missouri. Weimholt opined that the second hypothetical posed by the ALJ would preclude Lewis's past work as a sewing machine operator, but that a person with her age, education and job experience could work as a small parts assembler, inspector hand packager or simple cashier with the stated limitations. Weimholt testified that there were at least 5,000 assembler jobs in Missouri, about the same number of hand packager jobs and about 1,000 local simple cashiering jobs. While Weimholt believed that the limitations posed by the third hypothetical also precluded past work, he stated that a person with Lewis's background and the stated limitations could perform simple assembly jobs, simple hand packaging jobs and some cashiering jobs. Weimholt testified that there were about 4,500 simple assembly jobs in Missouri and approximately 500 local cashiering jobs.

Lewis's counsel then posed the following hypotheticals to Weimholt:

Q:     Okay. If — on the — if we would hypothesize that she's limited to lifting five pounds or less, frequently or occasionally and that she has uncontrolled crying, which occurred, I believe she says on a daily basis, and just, just take those two symptoms. Would those allow for any substantial activity, gainful activity?

A:     Well, there are — with, you know — the — very few jobs, although that cashier job would fit under that in terms of lifting. With respect to crying, you know, I don't know — we got — how long that is, but, but I would agree, if, if crying is uncontrolled and could occur at any point unexpectedly in the work situation in such a way as to, to

-8-

result in inability to perform the job at that point in time, and if that's a daily occurrence, every day, you know, and then I would agree that that would, that would preclude work.

Q:     If — and if — let me ask you a separate hypothetical.  If she would, when she sits, have to recline because of her hernia conditions, as she testified, would there be jobs that would allow you to sit in a reclining position through most of the day?

A:     No, sir.

### Medical Records

Lewis was followed by Dr. David Myers from November 29, 1995 through May 26, 2000.  On February 2, 2000, Myers noted that Lewis complained of increasing back pain and mood swings.  On March 2, 2000, Lewis stated that her right knee cap "slides and swells when walking."  Later that month, Lewis told Myers that she had heart palpitations, vertigo and right foot numbness while walking.

Lewis saw Dr. Dana Voight about her hernia and endometriosis in December of 1999.  Lewis was admitted to Phelps County Regional Medical Center on January 12, 2000, and a total abdominal hysterectomy, bilateral salpingo-oophorectomy and prolene mesh ventral wall hernia repair were performed.  After Lewis was discharged from the hospital, Voight noted that she was doing well but could expect an extended post-operative recovery due to the size of the hernia.

About one month after her surgery, Lewis reported continued pain over the lower part of her incision, problems with hard stools and leg pain. Voight diagnosed obstipation and pain and recommended a colonoscopic evaluation. Lewis was admitted to Phelps County Regional Medical Center for a colonoscopy in March of 2000, and after her release Voight diagnosed pelvic pain and constipation. Lewis saw Voight again in 2002 and complained of abdominal pain. Voight diagnosed recurrent ventral hernia and indicated that repair surgery would enable Lewis to avoid major intra-abdominal surgery, potential bowel death and incarceration of the hernia in the future. Voight noted that Lewis refused the recommended surgery.

Lewis was evaluated by Dr. Brian Cysewski, clinical psychologist, at the request of the Social Security Administration on three separate occasions. The first examination took place on January 31, 2000, but was actually requested in connection with a prior application of benefits. Nonetheless, the first evaluation was submitted to the ALJ at the first hearing and is part of the administrative record in the instant action. Cysewski's diagnostic impression of Lewis at the conclusion of the first evaluation was Axis I Major Depression, Axis II Deferred, Axis III See medical records, Axis IV Unemployment, chronic terminal illness in the family and Axis V 55.

During his second evaluation of Lewis on June 26, 2000, Cysewski

administered the Minnesota Multiphasic Personality Inventory-2 Test and concluded that Lewis's behavior during the test "was suggestive of malingering and at least indicative of exaggeration." His diagnostic impression at the conclusion of the second evaluation was Axis I R/O (rule out) Malingering, R/O Major Depression, Axis II Deferred, Axis III See Medical Record, Axis IV Unemployment and Axis V 60.

Cysewski evaluated Lewis for the third time at the request of the SSA on January 4, 2002 and diagnosed her as Axis I Probable Malingering, Axis II Dependent Personality Traits, Axis III See Medical Record, Axis IV Deferred and Axis V 60.

Lewis was treated by Dr. Mary Jane Mason for abdominal and back pain from June 14, 2000 through May 9, 2003. In January of 2001, Mason diagnosed Lewis as depressed (bipolar). On March 20, 2001, Mason diagnosed Lewis with lower abdominal pain chronic and depression. On April 6, 2001, Mason noted that Lewis had a dull affect, low back pain, right groin pain and was bipolar. On April 17, 2001, Mason indicated that Lewis still had a dull affect, poor eye contact and was "near tears at times." Her diagnosis at that time included depression, anxiety, sleep disorder, right groin and abdominal pain and low back pain. The next month, Lewis saw Mason again and was diagnosed with right groin pain, low back pain,

obesity, depression and bipolar.  In August of 2001, Mason noted that Lewis still possessed a dull affect, but she was talkative.  Mason diagnosed Lewis with possible sleep apnea and low back pain.

Mason saw Lewis about once a month from June 26, 2002 through May 9, 2003.  In June, Mason diagnosed right knee pain, ventral hernia and obesity.  In August, Mason's diagnosis was asthma, menopause and ventral hernia.  In September, Lewis complained of right-sided neck pain extending to her back.  Mason diagnosed her with neck pain.  In October, Mason diagnosed chronic groin and back pain, along with ventral hernia.   In November, Mason again diagnosed a hernia, chronic low back pain and allergies.  Mason noted that Lewis still had a dull affect during her December visit, but that she was alert and talkative.  Her diagnosis remained the same - i.e., low back pain, hernia and allergies.

Mason did not diagnose Lewis with dull affect after her December 2002 visit.  She did, however, diagnose Lewis with low back pain and a ventral hernia in February of 2003 and added left groin pain, depression and anxiety to the diagnosis in March.  By May of 2003, Mason noted that Lewis's nerves had been "pretty stable lately," and that Lewis appeared "alert, appropriate" and in "no distress."

Lewis was evaluated by Dr. John Demorlis for a "disability physical" on

October 25, 2001. He noted that Lewis said "she can only walk fifty feet 'then I need to sit down.' She walked further than that to get here from the outdoors, probably one hundred yards. In regard to standing, she claims five minutes but she stood here longer than that." His diagnostic impression was as follows:

1) Chronic abdominal wall pain secondary to multiple abdominal procedures
2) Chronic low back pain, etiology
3) Right inguinal hernia (recurrent)
4) Status post right inguinal hernia repair with mesh
5) Status post total hysterectomy due to endometriosis
6) Exogenous obesity
7) Status post three c-sections
8) Stress urinary incontinence
9) 34 pack/year history of tobacco use, ongoing
10) Status post laparoscopic cholecystectomy
11) Status post appendectomy
12) Moderate venous insufficiency of legs
13) Status post bilateral carpal tunnel
14) History of asthma
15) Depression
16) Status post cartilage removal right knee

Lewis was treated by Dr. Hugh Schuetz from April 19, 2004 through December 10, 2004. On April 15, 2004, Lewis complained of back pain and was diagnosed with an abdominal wall hernia, degenerative osteoarthritis, chronic obstructive pulmonary disease and chronic pain. Schuetz noted that Lewis was "manic depressive" in her patient history and proscribed Percocet for pain. On May 14, 2004, Lewis told Schuetz that she had "pain above navel when coughing." The

diagnosis included chronic obstructive pulmonary disease and chronic pain. On June 18, 2004, Schuetz diagnosed Lewis with an abdominal wall lesion, chronic pain and a reactive airway. On July 16, 2004, Lewis told Schuetz that she was experiencing abdominal and back pain. Schuetz diagnosed Lewis with degenerative osteoarthritis, chronic low back pain, chronic pain syndrome and chronic obstructive pulmonary disease and prescribed Trazadone, Primarin, Amitriptyline, Soma, Xanax, Percocet, Carbidopa, Iotex and Benzonatate.

A Spirometry Test was performed at Phelps County Regional Medical Center on July 29, 2004. The diagnosis was as follows:

> There is a moderate obstructive lung defect. The airway obstruction is confirmed by the decrease in flow rate at peak flow and flow at 25%, 50% and 75% of the flow volume curve. Lung volumes are within normal limits. Diffusion capacity is within normal limits. FEV1 changed by 12%. FEF 25-75 changed by 41%. This is interpreted as a significant response to bronchodilator.

On October 14, 2004, Lewis saw Schuetz about a cough, chills and acid reflux. Schuetz diagnosed bronchitis, cough, chronic obstructive pulmonary disease, reactive airway, chronic pain syndrome and degenerative osteoarthritis.

On November 12, 2004, Lewis reported sharp pain the right lung and shortness of breath. Schuetz diagnosed chest pain, chronic obstructive pulmonary disease, chronic back pain and deconditioned. About a month later, Schuetz again

diagnosed Lewis with chronic obstructive pulmonary disease, as well as reactive airway, movement disorder, gastrophageal reflux disease, osteoporosis and chronic pain syndrome.

The ALJ permitted Lewis to submit additional medical records from Schuetz after the second hearing on November 9, 2004. To supplement the record, Lewis sent Schuetz two SSA forms -- the Physical Medical Source Statement and Medical Assessment of Ability to do Work Related Activities (Mental) -- on November 12, 2004 with the following note:

> I went for a hearing for my disability. I need you to fill it [the SSA forms] out and send it back to them. I told them I can't lift over 5 lbs or do anything that strains my hernia have to sit in a recliner most of the time. have trouble walking, bad right knee, reacuring [sic] hernia, back pain, corpral [sic] tunnel, empasema [sic], asthma, vericoise [sic] veins, stigmatism in eyes, obese. manic depression, constant pain, cry a lot, walk with cane keep me from falling so I don't bust my hernia, panic attack can't straighten left arm due to it being ripped of [sic] and put back on. get dizzy, heart mumer [sic], cough a lot and were [sic] a pad because I wet myself. ankles swell up. arthritis in knee and joints.

Schuetz completed the forms the next day. He indicated that Lewis could frequently lift and/or carry 5 pounds; occasionally lift and/or carry 10 pounds; stand and/or walk a total of 2 to 3 hours, continuously for 20 minutes; and sit a total of 5 to 6 hours, continuously for 30 minutes. Schuetz indicated that Lewis's ability to push and/or pull was limited; that she could never climb, balance, stoop, kneel,

crouch or bend; and that she was limited in her reaching, handling and fingering. Schuetz indicated that Lewis would have environmental restrictions in regard to heights, machinery, temperature extremes, dust, fumes, humidity, vibration, etc. He also indicated that the statement included a consideration of pain, discomfort and/or other subjective complaints. Schuetz also stated that rest, assuming a reclining position up to 30 minutes for 1-3 times per day and propping her legs up to a height of 2 to 3 feet for 1-3 times per day would be helpful.

Schuetz also completed the Medical Assessment of Ability to do Work Related Activities (Mental). Schuetz rated Lewis's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently and maintain attention/ concentration as either "fair" or "poor to none." Schuetz rated Lewis's ability to understand, remember and carry out complex job instructions as "poor or none." He gave the same rating to Lewis's ability to understand, remember and carry out detailed, but not complex, job instructions. Schuetz evaluated Lewis's ability to understand, remember and carry out simple job instructions as "fair." Schuetz rated Lewis's ability to maintain her personal appearance as "poor or none," and her ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability as "fair."

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work

activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective

complaints, the ALJ is required to consider the factors set out by <u>Polaski v. Heckler</u>,

739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters
> as: (1) the objective medical evidence; (2) the subjective
> evidence of the duration, frequency, and intensity of plaintiff's
> pain; (3) any precipitating or aggravating factors; (4) the
> claimant's daily activities; (5) the dosage, effectiveness and side
> effects of any medication; and (6) the claimant's functional
> restrictions.

<u>Id.</u> at 1322.

A treating physician's opinion should not ordinarily be disregarded and is

entitled to substantial weight.  <u>Singh</u>, 222 F.3d at 451.  A treating physician's

opinion concerning a claimant's impairment will be granted controlling weight, if the

opinion is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record.

<u>Id.</u>  While a treating physician's opinion is usually entitled to great weight, the

Eighth Circuit has cautioned that an opinion "do[es] not automatically control, since

the record must be evaluated as a whole."  <u>Prosch v. Apfel</u>, 201 F.3d at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard the

opinion of a treating physician in situations in which other medical assessments "are

supported by better or more thorough medical evidence" or in which a treating

-20-

physician gives inconsistent opinions that undermine the credibility of the opinions. Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).  In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion.  Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## The ALJ's Findings

The ALJ issued his decision that Lewis was not disabled on March 14, 2005. In reaching his decision, the ALJ followed the five-step sequential evaluation process, noting at step one that Lewis had not engaged in substantial gainful activity since March 20, 2001.  Proceeding to step two of the analysis, the ALJ found that Lewis had severe impairments of chronic obstructive pulmonary disease, degenerative lumbar disease and recurrent hernias, but that her alleged vision, knee, carpal tunnel syndrome and mental impairments were not severe impairments within the meaning of the Social Security Act.  In particular, the ALJ found the following with respect to Lewis's depression:

> The depression has also not been severe.  The only abnormality the claimant complained of from a mental standpoint was crying spells, and a review of Dr. Mason's records shows that, other than one occasion in which slow speech was assessed and one occasion in which poor eye contact was assessed, no abnormality was assessed except for a dull

affect, and this assessment was no longer made after December 2002. Additionally, the medical record does not show any mental health treatment other than psychotropic medication, and the claimant informed Dr. Mason on at least one occasion that the medication had been effective, while a May 2003 report from Dr. Mason shows that the claimant's "nerves have been pretty stable lately." Furthermore, Brian Cysewski, Ph.D., conducted a consultative evaluation of the claimant in January 2002 and did not even discern an Axis I disorder, save for probable malingering. In November 2004, Hugh Schuetz, M.D., a physician who began treating the claimant in April 2004, opined that the claimant had either a fair ability or a poor ability in virtually all listed mental arenas, fair being defined as seriously limited. However, Dr. Schuetz's opinions are not given any weight because the doctor did not provide any data to support them. He did not even provide a diagnosis for a mental disorder. Nor do the doctor's treatment notes show a diagnosis for a mental disorder, and to the extent psychiatric evaluations were performed by the doctor, normal results were demonstrated. The claimant has thus had no episodes of decompensation, no restrictions of activities of daily living, no difficulties maintaining concentration, persistence or pace, and not more than mild difficulties maintaining social functioning.

(internal citations omitted). At step three of the evaluation process, the ALJ concluded that Lewis's condition "has not met or medically equaled a listing in 20 C.F.R. pt. 404, subpt. P. app. 1." Therefore, at step four, the ALJ noted that "the issue is thus reduced to whether the claimant has been able to perform her past relevant work and, if not, whether she has been able to perform any other work existing in significant numbers in the national economy. The answer will depend on the claimant's residual functional capacity."

The ALJ summarized the standard for determining residual functional

capacity as follows:

> Residual functional capacity is the functional ability that remains
> despite impairments. The determination of that ability derives from all
> relevant evidence, including the medical evidence and the claimant's
> credibility. In assessing credibility the adjudicator considers: 1) the
> claimant's daily activities; 2) the location, duration, frequency and
> intensity of the claimant's pain or other symptoms; 3) factors that
> precipitate and aggravate the symptoms; 4) the type, dosage,
> effectiveness, and side effects of any medication the claimant takes or
> has taken to alleviate pain or other symptoms; 5) treatment, other than
> medication, the claimant receives or has received for relief of pain or
> other symptoms; and 7) any other factors concerning the claimant's
> functional limitations and restrictions due to pain or other symptoms.

(internal citations omitted). The ALJ assessed Lewis's credibility as follows:

> The history of the claimant's applications for benefits suggests that she
> is benefit motivated. An Administrative Law Judge rendered an
> unfavorable decision on a previous claim on March 19, 2001. The
> claimant sought relief from the Appeals Council on May 2, 2001, but
> they denied claimant any relief on July 26, 2001. Almost immediately
> (August, 2001), the claimant filed a new claim for benefits. Between
> March 19, 2001 and August of 2001, there was no significant change
> or decline in the claimant's medical condition. That the claimant
> nonetheless immediately applied for benefits again reflects that the
> claimant is benefit motivated and was trying for a "second bite of the
> apple." Such benefit motivation detracts from credibility. The
> claimant testified that she has been unable to work because of
> shortness of breath and pain about her back. She asserted that she has
> been unable to lift or carry more than five pounds. She also asserted
> that she has had difficulty sitting due to back pain. The medical
> evidence does not support a finding of disability
>
> . . .
>
> Not only does the medical record not support the claimant, but the
> claimant lacks credibility. As for daily activities, the claimant informed
> Dr. Cysewski that she performed few, if any, activities of daily living,

but informed Dr. Demorlis that she had no restrictions of activities of daily living.

The ALJ then analyzed the medical evidence of Lewis's impairments and

made the following findings:

Regarding intensity and frequency of symptoms, the record shows that the claimant has been able to smoke cigarettes in spite of her respiratory condition. Additionally, the record shows that only conservative treatment has been provided for the claimant's lumbar condition, namely, analgesics, and more remotely, nerve block and facet joint injections, in May 2001. Moreover, the claimant informed Dr. Demorlis that she could only walk fifty feet at one time and that she could only stand five minutes at a time, but the doctor observed the claimant walk about 100 yards and stand longer than five minutes. Although the claimant entered the hearing room walking very slowly with a cane in one hand and holding onto her representative's arm with the other hand, the reasonable inference is that this presentation was contrived to demonstrate a disabling condition that does not exist, for it is grossly disproportionate to the medical record. This assumption is buttressed by Dr. Cysewski's conclusion that the claimant is a manipulative individual and an exaggerator, if not a malingerer, and the doctor's conclusion was based on three evaluations of the claimant over a two-year period, the evaluations including a study of the claimant's results on the Minnesota Multiphasic Personality Inventory, among other things. Regarding treatment other than medication, the claimant asserted that Dr. Schuetz prescribed a cane for her, but as already noted, the doctor's notes do not corroborate this assertion. With respect to the other factors, the claimant previously testified that her last job ended for a reason other than impairment, to wit, because of a work-related disagreement between her and her employer.

(internal citations omitted). The ALJ discounted the medical evidence offered by

Lewis's treating physician Dr. Schuetz for the following reasons:

In November 2004, Dr. Schuetz opined that the claimant could only lift or carry ten pounds on an occasional basis and five pounds on a frequent basis, could only sit for periods of thirty minutes for a total of five to six hours in an eight-hour day, and could only stand or walk for periods of twenty minutes for a total of two to three hours in an eight-hour day. Dr. Schuetz also opined that the claimant could never climb, balance, stoop, kneel, crouch or bend, had a limited ability to reach, handle and finger, would need to assume a reclining position for thirty-minute periods one to three times a day, and would sometimes need to elevate her legs. However, these opinions are given slight weight because they are inconsistent with the doctor's examination results for the claimant. It is particularly peculiar that the doctor would opine the claimant needed to elevate her legs when his notes do not mention edema, or that he would opine the claimant had a limited ability to handle and finger though his notes do not mention an upper extremity impairment. The opinions are also inconsistent with the record as a whole. They are also suspect because the claimant sent Dr. Schuetz a note just before he made the opinions and in the note she informed the doctor how she had testified about her condition and limitations at her disability hearing. This factor certainly does not bode well for the credibility of the claimant or Dr. Schuetz.

(internal citations omitted). The ALJ therefore reached the following conclusions:

In light of the foregoing, the undersigned finds that, since March 20, 2001, the claimant has had the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently, occasionally negotiate stairs and ramps, and occasionally bend, crouch and crawl, but she has been unable to climb. She has not has any other limitations.

The claimant has past relevant work experience as a sewing machine operator — specifically, she sewed labels on pants. Mr. Weimholt, the vocational expert, testified that an individual with the above-stated functional capacity could perform this job if it is performed as customarily performed in the national economy. This testimony is credible. It also bears mentioning that the Dictionary of Occupational

Titles shows that this job does not customarily require any crouching, crawling or climbing. Thus, the claimant has been able to perform her past relevant work as a sewing machine operator since March 20, 2001.

. . .

Even if it were assumed that the claimant had greater limitations than that stated above, she would still not be disabled. The vocational expert was asked to identify jobs that could be performed by a hypothetical individual who could sit six hours in an eight-hour day, but could not lift or carry more than ten pounds and could only lift from floor level on a less-than-occasional basis, could only stand or walk for periods of thirty minutes for a total of two hours in an eight-hour day, could only stoop, bend, crouch and crawl on a less-than-occasional basis, could only have brief and superficial interaction with supervisors, co-workers and the public, and could only perform simple, repetitive tasks - the individual's age, education, and vocational background matching that of the claimant. The vocational expert testified that such an individual could perform work as an assembler, of which 4,500 jobs exist in Missouri; or as a hand packager, of which 1,000 jobs exist in Missouri; or as a cashier, of which 500 jobs exist in Missouri. The number of jobs identified is significant.

(internal citations omitted).

## Discussion

On appeal, Lewis alleges that the ALJ's conclusions on residual functional capacity are erroneous because he failed to find that Lewis suffered from a severe mental impairment. Lewis argues that the ALJ erred in reaching this conclusion because it contradicted the opinion of her treating physician and was supported only by the opinion of the consulting psychologist. In response, the Commissioner maintains that the ALJ properly assessed the credibility of Lewis's treating

physician and correctly evaluated her residual functional capacity.

I find that substantial evidence supports the ALJ's decision, upon which he arrived following a proper legal analysis. Under the standards set out in Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001), residual functional capacity "is the most [a person] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545, 416.945. This determination turns on "all of the relevant medical and other evidence," including statements from the claimant. Id. This evidence includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; (6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Polaski, 739 F.2d at 1321-22; 20 C.F.R. §§ 404.1529, 416.929.

The ALJ adequately considered the entire record in his determination that Lewis had the residual functional capacity to lift or carry 20 pounds occasionally

and 10 pounds frequently, occasionally negotiate stairs and ramps, and occasionally bend, crouch and crawl, but not climb, without any other limitations. In rejecting Lewis's claim of a severe mental impairment, the ALJ reviewed the treatment records of Dr. Mason, which established that Lewis complained of crying spells and that Mason noted slow speech on one occasion, poor eye contact on one occasion and dull affect, which was no longer observed after December 2002. Mason also noted that Lewis's nerves were "pretty stable" in May of 2003, indicating that the prescribed medication was effective. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)(quoting Stout v.Shalala, 988 F.2d 853, 855 (8th Cir. 1993)).

The ALJ also considered Dr. Cysewski's consultative evaluations of Lewis, the most recent occurring in January 2002. After seeing Lewis on two prior occasions, Cysewski did not diagnose an Axis I condition other than probable malingering. In addition, the ALJ recognized, but ultimately discounted, the opinions of Dr. Schuetz for the following reasons:

> Dr. Schuetz's opinions are not given any weight because the doctor did not provide any data to support them. He did not even provide a diagnosis for a mental disorder. Nor do the doctor's treatment notes show a diagnosis for a mental disorder, and to the extent psychiatric evaluations were performed by the doctor, normal results were

demonstrated. The claimant has thus had no episodes of decompensation, no restrictions of activities of daily living, no difficulties maintaining concentration, persistence or pace, and not more than mild difficulties maintaining social functioning.

Lewis contends that the ALJ erred in discounting the opinion of Schuetz, her treating physician, and relying instead on the opinion of Cysewski, a consulting psychologist. Lewis further argues that Cysewski's diagnosis is contrary to the medical evidence.

In this case, the ALJ gave sufficient reasons for discounting the opinions of Dr. Schuetz. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (upholding an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "are supported by better or more thorough medical evidence" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions) (internal citations and quotation marks omitted).

First, as noted above, Schuetz did not provide any data to support his opinion that Lewis was significantly limited in almost every mental arena. Schuetz never actually diagnosed Lewis with a mental disorder, and the psychiatric evaluation performed by him actually revealed normal results. Moreover, Schuetz's recommended course of treatment is inconsistent with his opinion because he did

not treat Lewis for mental impairments or recommend that she seek the assistance of a mental health professional. Instead, he merely continued Lewis's prescriptions for psychotropic medications. The ALJ found similar disparities between Schuetz's treatment notes and his assessment of Lewis's physical limitations, as well as disparities between Schuetz's assessment and the other evidence in the record of Lewis's limitations.

The ALJ properly discounted the credibility of Schuetz's opinions because they were rendered after he received a note from Lewis detailing her testimony at the second hearing. Given the lack of data supporting Schuetz's opinions, the discrepancies between his opinions and his recommended course of treatment and his questionable credibility, it was proper for the ALJ to rely on other, more credible evidence in the record regarding Lewis's mental impairments. Credibility determinations, when adequately explained and supported, are for the ALJ to make. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). Because the ALJ gave his reasons for discrediting Schuetz's opinions, which were supported by the record, I will defer to his judgment. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir 2001).

Moreover, contrary to Lewis's assertion, the consultative psychologist's opinions were not inconsistent with the other medical evidence of Lewis's mental impairments. As discussed above, the ALJ thoroughly reviewed all of the evidence

(including Dr. Mason's treatment notes), not just the opinions of Cysewski, before

concluding that Lewis did not suffer from a severe mental impairment. Even

Cysewski's diagnosis was not based on a single consultative examination, but was

instead rendered after three evaluations of Lewis, one of which included

administration of the Minnesota Multiphasic Personality Inventory-2 Test. Lewis's

behavior during the test "was suggestive of malingering and at least indicative of

exaggeration," and Cysewski later confirmed the Axis I diagnosis of probable

malingering during the third examination in 2002. More weight is generally given to

the opinion of a specialist (here Cysewski -- a psychologist) about medical issues

related to his or her area of specialty than to the opinion of a source who is not a

specialist (in this case Schuetz -- a physician treating Lewis primarily for physical

problems). See 20 C.F.R. §§ 404.1527(d)(5) and 426.927(d)(5) (2005). This is

especially true in this case where Cysewski's opinions were formed after multiple

examinations of Lewis. Based on the credible medical evidence of record regarding

Lewis's alleged mental impairments, the ALJ properly found that her depression

was not a severe impairment in that it did not impact her ability to perform work

activity in more than a minimal fashion.

　　　　Lewis's sole challenge to the ALJ's determination of her residual functional

capacity is that the ALJ erred by refusing to consider her alleged severe mental

impairment as one of her limitations.   This argument fails because, as discussed above, substantial evidence in the record supports the finding that Lewis did not have a severe mental impairment.  Therefore, the ALJ properly determined her residual functional capacity by refusing to include it as one of Lewis's limitations. In support of her argument that the ALJ should have relied on Dr. Schuetz's opinion when fashioning her residual functional capacity, Lewis cites Cox v. Barnhart, 345 F.3d 606 (8th Cir. 2003), in which the Eighth Circuit held that "the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision.  This is especially true when the consultative physician is the only examining doctor to contradict the treating physician."  Id. at 610 (internal citations and quotation marks omitted).

Cox is distinguishable from the present case for two reasons.  First, the ALJ in the present case did not rely solely on "the results of a one-time medical evaluation" in his determination that Lewis did not have a severe mental impairment.  As discussed above, the ALJ relied on the opinion of the consultative examiner as well as additional medical evidence in the record, including the treatment notes of Lewis's treating physician, Dr. Mason.  Second, unlike the consultative physician in Cox, Cysewski was not the only examining doctor to contradict Schuetz.  Cysewski's opinions were consistent with Mason's notes that

Lewis's nerves were "pretty stable," and were also consistent with Schuetz's psychiatric examination (which indicated normal results) and his recommended course of treatment. See Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) (holding that ALJ may properly discredit treating physician's opinion when determining residual functional capacity if opinion is not supported by medical evidence and is contrary to other evidence in the record). For these reasons, Cox does not compel me to reverse the ALJ's decision.

Because substantial evidence in the record as a whole supports the ALJ's determination of Lewis's residual functional capacity and his finding of no disability, I will uphold his decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of September, 2006.